UNITED STATES of America

v.

Anthony R. DOTE, et al., Defendants.

No. 00 CR 342.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 5, 2001.

John L. Burley, U.S. Attorney's Office, Chicago, IL, for Plaintiff.

Joseph M. Urgo, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

MORAN, Senior District Judge.

The government has brought a seven-count indictment against an alleged bookmaking ring, including defendant Anthony Dote. The charges include operating an illegal gambling business, 18 U.S.C. § 1955, use of interstate facilities to further unlawful activity, 18 U.S.C. § 1952, and RICO violations. 18 U.S.C. § 1962(c)-(d). Dote has filed two motions to dismiss the indictments, from which we have dis-

cerned seven constitutional and statutory arguments. For the following reasons, defendant's motions are denied.

## BACKGROUND

Defendant Dote is charged with operating a sports gambling ring from approximately July 1994 through August 1997. The enterprise allegedly accepted bets on football, basketball, hockey and baseball games. Its customers are in the Chicago area, but it routinely obtained betting line and point spread information, by telephone, from Nevada.

This was not Dote's first venture into the illegal gambling business. He was indicted for bookmaking and RICO violations (among other charges) in 1994. Pursuant to a plea agreement, he was sentenced to 51 months on September 13, 1996. The government knew the facts alleged in the current indictment, namely that Dote was still bookmaking while on bond, before his 1996 sentencing. The government, however, declined to present this evidence to the court in seeking a sentencing enhancement. Dote served 38 months and was released in February 2000. Two months later, on April 27, 2000, a grand jury returned the current indictment.

## DISCUSSION

### I. *Speedy Trial*

■ Defendant first argues that the government's failure to indict him sooner violated his right to a speedy trial.[1] The Sixth Amendment right to a speedy trial is only triggered by an arrest, indictment or other official accusation. *See United*

1. The alleged enterprise operated from approximately July 1994 through August 1997. The indictment is dated April 27, 2000.

2. Cases finding a pre-indictment delay unconstitutional do exist, but they are exceedingly rare. *See, e.g., United States v. Sabath,* 990

*States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). This is not at issue here. The primary pre-indictment time restriction is the statute of limitations. *Id.* at 322, 92 S.Ct. 455. That too was clearly satisfied here. The Supreme Court, however, has recognized that an extended pre-indictment delay can also violate a defendant's Fifth Amendment due process rights. *See United States v. Lovasco,* 431 U.S. 783, 789–90, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).[2] The standards for determining if a delay amounts to a Fifth or Sixth Amendment violation are somewhat different, and the parties here have conflated them, so we will spell them each out in some detail.

■ The seminal Sixth Amendment speedy trial case is *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). It outlines four factors for assessing these claims: whether the delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether the defendant timely asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result. *Id.* at 530, 92 S.Ct. 2182. Defendant relies on a line of cases holding that long delays presumptively prejudice the defendant. *See Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973); *Klopfer v. North Carolina,* 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967); *Doggett v. United States,* 505 U.S. 647, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992). There are indeed numerous cases discussing at what point a delay becomes presumptively prejudicial, primarily because it is a threshold question in applying the *Barker* test.[3] The flaw in

F.Supp. 1007, 1018 (N.D.Ill.1998) (collecting cases).

3. Courts will generally only examine the latter three *Barker* factors if the delay was long enough to be presumptively prejudicial.

defendant's argument is that these are all Sixth Amendment, i.e. post-indictment, cases.[4]

The standard for a Fifth Amendment due process violation is less well defined. In discussing when a pre-indictment delay might be unconstitutional, the Supreme Court has eschewed any rigid rules, preferring a typically amorphous due process definition. The defendant must show his prosecution deviates from " 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' ... and which define 'the community's sense of fair play and decency.' " *Lovasco*, 431 U.S. at 790, 97 S.Ct. 2044 (internal citations omitted). Lower courts have typically employed a balancing test, weighing the prejudice to the defendant against the government's reason for delay. *See United States v. Sabath*, 990 F.Supp. 1007, 1018 (N.D.Ill.1998). The majority of circuits also require defendants to show The government acted in bad faith.[5] *Id.* at 1017 (collecting cases).

■ One thing that is clear, however, is that defendant must prove actual prejudice. *See United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). The Seventh Circuit emphatically stated:

[Defendant's] attempt to rely on a "presumption of prejudice" ignores our Circuit's law that "it is not enough ... to offer some suggestion of speculative harm; rather, the defendant must present concrete evidence showing material harm" to his ability to secure a fair trial. It is not enough simply to speculate ... that witnesses' memories might have faded because of the passage of time. In order to establish prejudice for due process purposes, a defendant's "allegation of prejudice must be specific, concrete and supported by the evidence-vague, speculative, or conclusory allegations will not suffice."

*Aleman v. Honorable Judges of Circuit Court of Cook County*, 138 F.3d 302, 310 (7th Cir.1998) (internal citations omitted). Possible or speculative harm is not sufficient. The harm must be substantial and certain. Similar to the Sixth Amendment cases, prejudice is a threshold question. The government need not explain its delay unless the defendant can first show actual prejudice. *Sowa*, 34 F.3d at 449–50. But defendant's attempts to import the presumptive prejudice standard from *Doggett* are misplaced. *See Aleman*, 138 F.3d at 309 (distinguishing between pre- and post-indictment delays); *United States v. Stoecker*, 920 F.Supp. 867, 871 (N.D.Ill. 1996).[6]

---

**4.** Contrary to defendant's assertion (def. br. at 6 n. 8), the cases collected in the 11th Circuit's *Doggett* opinion, 906 F.2d 573, 578 (11th Cir.1990), all involved post-indictment delays.

**5.** There is split authority on this point, and it is unclear into which camp the Seventh Circuit falls. *Compare Sabath*, 990 F.Supp. at 1017 (finding *United States v. Sowa*, 34 F.3d 447 (7th Cir.1994), does not require bad faith) *with Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir.1996) (characterizing *Sowa* as requiring bad faith). We decline to resolve how *Sowa* should be interpreted, however, because defendant has not made any threshold showing of prejudice.

**6.** Our research has revealed only one case applying the *Doggett* presumptive prejudice standard to a pre-indictment delay. *See United States v. Crouch*, 835 F.Supp. 938 (S.D.Tex. 1993). The Fifth Circuit explicitly rejected this reasoning, 51 F.3d 480, 484 (5th Cir. 1995) ("[W]e find this reliance [on Doggett] misplaced as 'pre-indictment delay does not raise a Sixth Amendment issue, but is instead examined under due process clause of the Fifth Amendment.' "), and ultimately reinstated the indictments. 84 F.3d 1497 (5th Cir. 1996) (*en banc* ).

We find the analysis in *United States v. Martinez*, 77 F.3d 332 (9th Cir.1996), which provides an almost identical fact pattern, particularly convincing. Martinez was indicted for, and pled guilty to, possession of stolen property, a $60,000 truckload of toys. The government also had tapes proving his complicity in a related scheme involving $1.4 million in stolen goods, but did not introduce that evidence at sentencing. Shortly before his scheduled release the government secured a separate indictment for the $1.4 million theft. Defendant moved to dismiss, claiming the delay prejudiced him in three ways. First, if charged together, he would have faced a total of 21 to 27 months in prison. Because he now had a prior conviction, Martinez faced 24 to 30 months for the second charge alone, in addition to the 8 months he had already served. Second, the prior conviction could be used to impeach him at the second trial. Finally, the separate convictions meant he would have two strikes under a state "three strikes" law.

The trial court found prejudice and granted the motion to dismiss. The Ninth Circuit, despite using a deferential abuse of discretion standard, reversed and reinstated the indictments. First, regarding trial prejudice, "The possibility that the government will use prior convictions for impeachment purposes is not the type of prejudice that violates principles of due process." *Id.* at 335. Second, any increased sentence would be speculative. If the trial judge found the delayed indictment yielded a longer than fair sentence under the guidelines, she could always take a downward departure. *Id.* at 336–37. Finally, the second strike would only be prejudicial if Martinez committed another crime, which was speculative. *Id.*

■ We agree. We do not see any certain prejudice to Dote caused by the delayed indictment. His motion does not cite any particular harm, only some abstract effect from sequential prosecutions. As a matter of law, his argument that prejudice is presumed is incorrect. He must not only particularize any prejudice, but also bears the burden of demonstrating that it is certain. His failure to do either is fatal to his claim. Even if Dote were to advance the arguments discussed in Martinez, we agree with the Ninth Circuit's disposition. First, all probative evidence is prejudicial. We only endeavor to eliminate things that are unfairly prejudicial. The evidentiary rules satisfactorily deal with balancing probative value and prejudicial effect. The appropriate remedy, if any, would be a motion *in limine* regarding use of the prior conviction, not dismissal. Second, we do have discretion to take departures if appropriate. And finally, we cannot presume that Dote will commit another crime in the future. Any harm would be speculative.

## II. *Continuous Crime*

■ Second, defendant argues that we must dismiss this indictment because RICO is a continuous crime. We interpret this as a claim that the acts alleged in the current indictment are a mere continuation of those in the prior indictment, and hence, not separately punishable. Notwithstanding defendant's protestations to the contrary, this does sound like a double jeopardy argument. As the government points out, however, the indictments allege distinct acts. If defendant committed additional crimes after his first indictment, he can be punished again. This is true even if they are the same type of crime, *i.e.* running a gambling ring. The second enterprise existed at a different time and involved different people.

Defendant terms this "punishment-on-the-installment-plan." We are not sure what he means by this. The closest legal analogies we can find are double jeopardy

and speedy trial. This does not violate double jeopardy. Indeed defendant claims not to raise this argument. And we have already rejected the speedy trial theory. We find nothing problematic with the new charges.

### III. Continuity Requirement

█ Defendant argues that "continuity" is an element of a RICO charge, and that the indictment is flawed for failing to allege it. He relies on several recent cases holding that an indictment must specifically allege all essential elements of the crime. *See, e.g., Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The essential elements are (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity. *Brouwer v. Raffensperger, Hughes & Co.,* 199 F.3d 961, 963 (7th Cir.2000). "Continuity" is not an element of a RICO violation, and need not be plead with particularity to survive a motion to dismiss. *See United States v. Palumbo Brothers, Inc.,* 145 F.3d 850, 877 (7th Cir.1998). Rather, the First Circuit has characterized continuity as "a necessary characteristic of the evidence used to prove the existence of a pattern." *United States v. Boylan,* 898 F.2d 230, 250 (1st Cir.1990).

The government will need to prove continuity at trial to satisfy the pattern element, but it is not an essential element for purposes of the indictment. The indictment alleges a sequence of gambling offenses, unfolding over an extended period of time. As individuals were arrested, other members of the enterprise assumed their responsibilities. This sufficiently pleads a pattern for present purposes. Because pattern is the essential element, not continuity, *Apprendi* is satisfied.

### IV. Operation or Management Requirement

██ Dote argues that because several of his co-defendants were low-level clerks and not managers or operators of the enterprise they should not be liable as RICO conspirators. Defendants Jack Cozzi, Sherman Goldman and Francis Mazza are only charged with conspiracy to violate RICO, § 1962(d), not a substantive RICO violation itself, § 1962(c). Under *Brouwer v. Raffensperger, Hughes & Co.,* control or management are not elements of § 1962(d):

> [O]ne's agreement must be to knowingly facilitate the activities of the operators or managers to whom subsection (c) applies. One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner. It is an agreement, not to operate or manage the enterprise, but personally to facilitate the activities of those who do.

199 F.3d at 967. The indictment alleges that Defendants Mazza and Cozzi obtained betting line information and recorded it as voice mail announcements (indict. at 2, ¶ 2(c)). Defendants Cozzi and Goldman allegedly answered phones and received bets for the enterprise (indict. at 2, ¶ 2(d)). Obtaining betting information, recording it in an announcement for bettors and receiving bets all facilitate the operation of an illegal gambling enterprise. This amply satisfies the *Brouwer* test.

Contrary to defendant's assertion (def. rep. at 2 n. 1), we have no reason to question that this is settled circuit law. While conceding that this standard "is not a bright line," and that "district judges will have to evaluate whether what a defendant agreed to do is sufficient to bring his conduct within subsection (d)," *Brouwer* is very clear that defendants need not be operators or managers. 199 F.3d at 967. In *United States v. Swan,* 224 F.3d 632 (7th Cir.2000), the Seventh Circuit reversed several RICO convictions because

of erroneous jury instructions as to § 1962(c). This has no bearing on the § 1962(d) charges, which are governed by *Brouwer*. In fact, *Swan* specifically cited *Brouwer* as the proper standard for § 1962(d). 224 F.3d at 635.

## V. *Wharton's Rule*

■ Next, defendant asserts that Wharton's Rule [7] prohibits the government from charging him with both RICO conspiracy and the predicate § 1955 violations. He properly identifies *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), as the decisive case, but reaches the wrong conclusion. In its simplest form, the rule means that the state cannot prosecute an agreement between two people to commit a crime, where the substantive crime necessarily requires two people. *Id.* at 773. Classic examples include bigamy, adultery and dueling. These crimes cannot be committed alone. By definition, they require two people to act together. Charging defendants for both conspiring and completing the act would be redundant.

But our analysis does not end here. First, we are mindful that Wharton's Rule is itself an exception to the general principle that a conspiracy and the substantive offense can constitute separate crimes. *Id.* at 781–82. Second, Wharton's Rule is only a presumption. *Id.* at 785–86. We presume that Congress does not mean to punish overlapping conduct separately, but where the legislature indicates otherwise, the presumption is rebutted. Consequently, *Iannelli* proceeded to discuss Congress' intent in enacting the respective statutes. Typically, we punish conspiracies because

we fear that criminals working together are particularly dangerous, and that one agreement to commit a crime may lead to others. The five-person requirement in § 1955, however, serves a very different purpose. This element, as well as the 30–day and $2,000 requirements, was a means of limiting federal jurisdiction. Congress wanted to allow federal prosecution of large gambling operations, which are more likely to affect federal interests, while leaving smaller ones to the states. *Id.* at 789–90.

■ A § 1962(d) RICO violation, on the other hand, has substantially different elements. Unlike § 1955, the government must satisfy all the traditional requirements of a conspiracy, including an agreement and an overt act. The most dramatic difference, however, is that defendants must have conspired to commit a pattern of racketeering. This means proving two or more predicate offenses. Congress' distinct purposes are apparent. One statute, § 1955, is intended to punish large gambling operations. The other, § 1962(d), targets conspiracies to commit repeated crimes. Congress is entitled to punish continuous criminal conduct more severely than discrete criminal acts.

Several courts have explicitly considered whether Wharton's Rule bars prosecution for both RICO and its predicate offenses. Without exception, relying on *Iannelli*, these courts have allowed both charges to stand.[8] *See, e.g., United States v. Pungitore*, 910 F.2d 1084, 1108 (3d Cir.1990); *United States v. Rone*, 598 F.2d 564 (9th Cir.1979); *United States v. Gambale*, 610 F.Supp. 1515, 1546 (D.Mass.1985); *United*

---

**7.** The name derives from scholar Francis Wharton, whose criminal law treatise first identified the doctrine and explained its rational. *See* 2 Wharton, *Criminal Law* § 1604, p. 1862 (12th ed.1932).

**8.** Because the indictment also charges violations of state gambling laws as predicate offenses, it is worth noting that Illinois has explicitly repudiated Wharton's Rule. *See People v. Cooper*, 239 Ill.App.3d 336, 179 Ill.Dec. 873, 606 N.E.2d 705, 718 (1992).

*States v. Boffa,* 513 F.Supp. 444, 478 (D.Del.1980). This is completely consistent with our other RICO jurisprudence. It is well established that a defendant can be charged, and also sentenced consecutively, for RICO and its predicate offenses. *See United States v. Morgano,* 39 F.3d 1358, 1366 (7th Cir.1994).

## VI. *Interstate Nexus*

Defendant next argues that the indictment does not allege a sufficient interstate nexus to support a federal prosecution. There are actually two separate bases for federal jurisdiction here, applying to different statutory charges. Congress enacted § 1955 because it found that gambling businesses affect interstate commerce. And it designed § 1952 to protect facilities of interstate commerce, in this case telephone lines. Both are predicate crimes under RICO. *See* 18 U.S.C. § 1961(1).

Once again, defendant conflates two distinct legal principles. He argues that the interstate telephone calls were too insignificant to justify federal prosecution. Rather than citing cases discussing facilities of interstate commerce, however, he cites cases defining the standard for effects on interstate commerce.[9] *See, e.g., Lopez,* 514 U.S. 549, 115 S.Ct. 1624 (finding gun possession in school zone did not sufficiently affect interstate commerce); *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (finding individual sexual assault did not sufficiently affect interstate commerce); *Jones v. United States,* 529 U.S. 848, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000) (finding arson in private residence did not sufficiently affect interstate commerce). Regardless, those cases are fundamentally different from the present one. They all involved exclusively intra-state conduct and non-economic activities. Although they restrict use of the aggregation principle[10] to argue that purely intra-state, non-economic conduct affects interstate commerce, the government may still use aggregation, and need only prove a *de minimus* effect on commerce, where the conduct is economic. *See United States v. Zizzo,* 120 F.3d 1338, 1350–51 (7th Cir.1997) (rejecting *Lopez* challenge to § 1955); *United States v. Peterson,* 236 F.3d 848, 853 (7th Cir.2001) ("[W]e do not believe *Morrison* undermines our prior holdings that a showing of a *de minimis* effect is constitutionally satisfactory.").[11]

Here, the alleged enterprise was a commercial for-profit venture. And the activities in question are decidedly economic—placing bets and collecting debts. Congress has made specific findings that large scale gambling operations affect interstate commerce. *See* National Gambling Impact Study Commission Act, Pub.L. 104–169, § 2, 110 Stat. 1482 (1996).

---

**9.** The leading recent commerce clause case, *United States v. Lopez,* distinguishes three bases under which Congress may invoke its commerce power: (1) to regulate the use of channels of interstate commerce; (2) to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) to regulate activities that substantially effect interstate commerce. 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). *Lopez* itself announced the prevailing standard for the third category.

**10.** This is the basic proposition that Congress may regulate even the smallest activities if, when viewed in aggregate, activities of that type affect interstate commerce. *See generally Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

**11.** While defendant may consider this language "cautious" (def. reply at 7), the court explicitly reaffirmed the *de minimis* standard. That is binding. The Seventh Circuit ultimately reversed the *Peterson* convictions because there was insufficient evidence that the stolen goods were from another state. There is no such requirement in § 1955. Further, the indictment clearly alleges that the point spread information came from Nevada.

The statute only applies to businesses involving five or more persons, continuously operating for more than thirty days and generating more than $2,000 gross revenue in a single day. 18 U.S.C. § 1955(b)(1). These elements are reasonably calculated to limit federal jurisdiction to larger gambling operations that are more likely to affect interstate commerce. We must defer to Congress' finding.

 We now turn to the facilities argument. Defendant contends that, because the point-spread information was also available locally, the use of interstate telephone lines was incidental to the enterprise, and that we should therefore discount it. As we discussed above, because there is no interstate act requirement in § 1955, this only relates to the § 1952 charge. There is nothing in our jurisprudence remotely suggesting that the federal government cannot prosecute federal crimes because a necessary component was also available locally. Almost any interstate crime *could* be committed exclusively locally. Defendants allegedly chose not to do so. By selecting a source outside Illinois, the enterprise subjected itself to federal law. That the information was otherwise available locally is immaterial.[12] Moreover, the interstate act in question was hardly incidental. Obtaining information about point spreads and betting lines is integral to sports gambling.

Although we are bound to follow the Supreme Court's recently announced limitations on Congress' commerce power, the facts here are well beyond anything the Court has found impermissible. We are not obliged to anticipate how the Court may extend its recent rulings based on "trends." And it would take a major leap beyond the Court's reasoning to date to reach this case. Under currently prevailing precedent, Congress may constitutionally reach the conduct alleged in this indictment.

## VII. *Forfeiture*

Lastly, there is some dispute over the amount of money subject to forfeiture. The parties agree that *United States v. Masters*, 924 F.2d 1362 (7th Cir.1991), provides the applicable legal standard—net revenues, not gross. They simply disagree over how much net revenues were. The indictment properly alleges an amount, and it is now the government's burden to prove it at trial. This is manifestly a question of fact, properly left to the jury, not something we can resolve on the pleadings.

## CONCLUSION

For the forgoing reasons, defendant's motions to dismiss the indictment are denied.

---

12. Because this indictment alleges defendants themselves made interstate phone calls, we need not address whether locally printed point spreads that ultimately trace back to Nevada sources would also be sufficient to support a federal indictment.